# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| SEAN WILSON, derivatively on behalf of TUPPERWARE BRANDS CORP., <br><br> Plaintiff, <br><br> v. <br><br> MIGUEL FERNANDEZ, CASSANDRA HARRIS, MARIELA MATUTE, SUSAN M. CAMERON, MEG CROFTON, DEBORAH G. ELLINGER, JAMES H. FORDYCE, RICHARD GOUIS, PAMELA J. HARBOUR, TIMOTHY MINGES, CHRISTOPHER D. O'LEARY, RICHARD T. RILEY, and M. ANNE SZOSTAK, <br><br> Defendants, <br><br> and <br><br> TUPPERWARE BRANDS CORP., <br><br> Nominal Defendant. | Case No.: <br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Sean Wilson ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Tupperware Brands Corp. ("Tupperware" or the "Company"), files this Shareholder Derivative Complaint against Defendants

Miguel Fernandez, Cassandra Harris, Mariela Matute, Susan M. Cameron, Meg Crofton, Deborah G. Ellinger, James H. Fordyce, Richard Gouis, Pamela J. Harbour, Timothy Minges, Christopher D. O'Leary, Richard T. Riley, and M. Anne Szostak (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Tupperware.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tupperware, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Middle District of Florida captioned *Edge v. Tupperware Brands Corp.*, No. 6:22-cv-1518 (M.D. Fla.) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action brought in the right, and

for the benefit, of Tupperware against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from November 3, 2021 to March 16, 2023 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Tupperware and its shareholders, including monetary losses and damages to Tupperware's reputation and goodwill.

2.     Tupperware is a consumer products company. Under the Tupperware brand, the Company markets produces and sells design-driven preparation, storage, and serving solutions for the kitchen and home. The Company primarily designs functional products to help store, serve, and prepare food.

3.     Tupperware enacted a three-year turnaround plan to generate new growth and bolster liquidity due to a decade of declining sales ("Turnaround Plan"). The plan consists of three goals: to sell non-core assets to improve liquidity, restructure debts, and fix core business to improve sustainability.

4.     This complaint arises from Tupperware representing to investors that its Turnaround Plan was a success.  This, however, was not true.  On May 4, 2022, the Individual Defendants revealed that the Turnaround Plan was "not on track." Tupperware expressed that inflation cost increases directly impacted profits. The 2022 first-quarter earnings

release stated in pertinent part: "[p]rofitability was significantly impacted by persisting inflationary pressures and the latency between rising input costs and our decision to increase prices."

5.     The market was stunned by Fernandez's admission that price hikes in May 2022 would be "the first time we've taken pricing actions in quite some time." This news clearly contradicted the claims made by the Individual Defendants that Tupperware was implementing meaningful price increases to cover costs. As a result of the dissemination of this previously undisclosed information, the price of Tupperware common stock fell $5.76 per share, or 32.16%, from a close of $17.91 on May 3, 2022, to a close of $12.15 per share on May 4, 2022, on extremely high trading volume.

6.     Exacerbating the situation, on March 1, 2023, the Company disclosed it discovered material misstatements in preceding annual and unaudited financial statements. On March 16, 2023, after the market closed, the Company filed with the SEC a Late filing notice on Form NT 10-K to correct material misstatements. The Late Filing Notice stated, "[t]o date, the misstatements that originated in periods prior to 2020 are expected to result in a $23-28 million reduction to the previously reported 2020 beginning retained earnings, with such reduction primarily resulting from misstatements related to income taxes." On March 16, 2023, the Company filed with the SEC a Current Report on Form 8-K, stating "[t]he Company

believes that the adjustments identified to date are primarily non-cash corrections related to income taxes and lease accounting treatment." Furthermore, the Company would subsequently delay the filing of its 2022 Annual Report on Form 10-K. As a result of the dissemination of this previously undisclosed information, the price of Tupperware common stock fell by $0.19 cents a share, or 7.7%, on March 17, 2023.

7.      As a result of the foregoing, Tupperware, its chief executive officer, and its chief financial officer have been named defendants in the Securities Action by investors who allege they were damaged when they purchased Tupperware shares during the Relevant Period.

8.      The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. It will likely cost the Company millions of dollars going forward.

9.      On September 28, 2023, the court in the Securities Class Action denied the Securities Action Defendants' motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Securities Class Action has exposed the Company to massive class-wide liability.

10.     To make matters worse, as the Company's share price declined, members of the Board approved their own improper and grossly excessive compensation without meaningful limits or controls, and without regard for the Company's stock price, revenue, and market capitalization.

11.     On May 31, 2023, Plaintiff sent a letter to the Tupperware Board of Directors (the "Board") demanding that the Board investigate the wrongdoing set forth herein and take appropriate action, including commencing litigation against current and former officers and directors (the "Demand").[1]

12.     On June 8, 2023, Tupperware's counsel wrote a response to Plaintiff's counsel, stating that the Board was not "taking any position upon the merits of [Plaintiff's] demands" and "is simply deferred further action at the present" because of overlap with the issues in the Demand and the Securities Action, as well as, a demand futility derivative matter filed in state court (the "Tupperware Response").[2]   As such, Plaintiff has not received a substantive response to the Demand or any date on which an investigation would even begin. Accordingly, the Demand in this case was refused.

## JURISDICTION AND VENUE

---

[1] A true and complete copy of the Demand is attached hereto as Exhibit A.

[2] A true and complete copy of the Tupperware Response is attached hereto as Exhibit B.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act (the "Exchange Act") and Rule 14a-9 of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Tupperware maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary

participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Tupperware, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of Tupperware common stock. Plaintiff has continuously held common stock at all relevant times.

### Nominal Defendant

18.     Defendant Tupperware is incorporated under the laws of Delaware, with its principal executive offices located at 14901 South Orange Blossom Trail, Orlando, Florida, 32837.  Tupperware common stock trades on the NYSE under the symbol "TUP."

### Defendants

19.     Defendant Miguel Fernandez ("Fernandez") is the President and Chief Executive Officer ("CEO") and a director since April 2020.  Defendant Fernandez is a member of the Executive Committee.

20.     Defendant Cassandra Harris ("Harris") served as the Company's Chief Financial Officer ("CFO") from April 2019 through May 2022. Defendant Harris also served as Chief Operating Officer.

8

21.     Defendant Mariela Matute ("Matute") has served as the Company's Chief Financial Officer since May 24, 2022.

22.     Defendant Susan M. Cameron ("Cameron") is the Chair of the Board of Directors (the "Board') of the Company since 2019. Defendant Cameron is a member of the Nominating, Governance & Social Responsibility Committee ("Nominating Committee") and the Compensation & Human Capital Committee. Defendant Cameron is also the Chair of the Executive Committee.

23.     Defendant Meg Crofton ("Crofton") has been a director of the Company since 2016. Defendant Crofton is the Chair of the Nominating Committee. Defendant Crofton is also a member of the Compensation & Human Capital Committee and the Executive Committee.

24.     Defendant Deborah G. Ellinger ("Ellinger") has been a director of the Company since 2021. Defendant Ellinger is a member of the Nominating Committee and the Compensation & Human Capital Committee.

25.     Defendant James H. Fordyce ("Fordyce") has been a director of the Company since 2021. Defendant Fordyce is a member of the Audit & Finance Committee ("Audit Committee") and the Compensation & Human Capital Committee.

26.     Defendant Richard Goudis ("Goudis") has been a director of the Company since March 2020.  Defendant Goudis is also a member of the

Executive Committee.

27.    Defendant Pamela J. Harbour ("Harbour") has been a director of the Company since 2021. Defendant Harbour is a member of the Audit Committee.

28.    Defendant Timothy Minges ("Minges") has been a director of the Company since 2021. Defendant Minges is a member of the Audit & Finance Committee.

29.    Defendant Christopher D. O'Leary ("O'Leary") has been a director of the Company since 2019. Defendant O'Leary was the Former Interim CEO of the Company from November 2019 through April 2020. Defendant O'Leary is a member of the Nominating Committee and the Executive Committee. Defendant O'Leary is also the Chair of Compensation & Human Capital Committee.

30.    Defendant Richard T. Riley ("Riley") has been a director of the Company since 2015. Defendant Riley is the Chair of the Audit Committee, and a member of the Nominating Committee and Executive Committee.

31.    Defendant M. Anne Szostak ("Szostak") has been a director of the Company since 2000. Defendant Szostak is a member of the Audit Committee and a member of the Nominating Committee.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

32.    By reason of their positions as officers, directors, and/or

fiduciaries of Tupperware and because of their ability to control the business and corporate affairs of Tupperware, the Individual Defendants owed Tupperware and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage Tupperware in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tupperware and its shareholders to benefit all shareholders equitably.

33.     Each director and officer of the Company owes Tupperware and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

34.     As fiduciaries of Tupperware, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

35.     The officers and directors of Tupperware were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

36.     Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. As Tupperware's directors

and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

37.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

38.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware,

Florida, the United States, and pursuant to Tupperware's Code of Conduct and internal guidelines;

b)    Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)    Remain informed as to how Tupperware conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection in addition to that and to take steps to correct such conditions or practices;

d)    Establish and maintain systematic, accurate records and reports of the business and internal affairs of Tupperware and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tupperware's operations would comply with all laws and Tupperware's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f) Exercise reasonable control and supervision over Company's officers and employees' public statements and any other reports or information that the Company was required by law to disseminate;

g) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h) Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

39. Each of the Individual Defendants further owed Tupperware and the shareholders the duty of loyalty, which requires that each favor Tupperware's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

40. At all times relevant hereto, the Individual Defendants were the agents of each other and Tupperware and were at all times acting within the course and scope of such agency.

41. The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial positions with Tupperware.

42.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tupperware.

## A. Tupperware's Code of Conduct

43.     The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Tupperware's Code of Conduct (the "Code of Conduct"). The Code of Conduct states, in pertinent part, the following:

**Introduction**

For over 70 years, we have maintained the highest standards of individual conduct from each member of our Board of Directors, our Associates, and our related and affiliated entities in every aspect of our business. We base our business conduct on fair dealing, consideration for the rights of others, and the highest principles of good corporate citizenship.

The areas covered in this Code of Conduct are those of most concern, and are not all-inclusive. No set of rules could cover all contingencies, and no system of  monitoring can detect all violations. Associates may obtain detailed guidance on the topics contained in this Code of Conduct, as well as other topics, through our Corporate Accounting Manual, selected policy statements, and through consultation with our personnel. If you have need for such guidance, contact our Chief Legal Officer or Chief Financial Officer.

Associates should report violations of our Code, and may do so on an anonymous basis. We will not tolerate retaliation against Associates who report violations in good faith. Disciplinary actions will result from violations of our Code and may include

termination of employment (see "Implementation of the Code of Conduct").

Management is accountable for compliance with our Code of Conduct and for Ensuring Associates receive sufficient training in matters addressed by our Code.

**Compliance with the Law**

Associates must comply with all laws and government regulations applicable to the conduct of our business.

Our Company commits to respect Human Rights in all of our businesses and activities worldwide.

For interpretation of legal and regulatory requirements, Associates should consult the Company's Chief Legal Officer.

**Accounting and Auditing**

Compliance with prescribed accounting and auditing policies and procedures is required at all times. We expect Associates having control over such matters to handle them with the strictest integrity, to ensure that we execute each transaction in accordance with management's authorization, and to properly and accurately record it in our accounting records. In addition to the above, Associate benefit plan assets and transactions are managed with care and prudence in accordance with applicable law

* * *

**Fair Dealing**

Directors, Officers and Associates should endeavor to deal fairly with our customers, suppliers, competitors and Associates. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practice.

* * *

**Securities Law Matters**

Our material inside information may not be used for private advantage and may be communicated only with great discretion by authorized persons and when properly authorized. Use of material inside information in connection with trading in our stock is not only a violation of this Code, but is also illegal under securities laws and may result in severe civil and criminal penalties. This policy also extends to trading in the stock of companies, which have significant relationships with our Company, including vendors.

Information is "material" if its possession would reasonably affect an investor's investment decision, and is "inside" if it has not been disclosed generally to the public. We will take all reasonable measures to maintain the confidentiality of our material inside information and to control the use of such information by Associates and advisors. We take particular care to prevent the disclosure of material inside information to outside parties. Such disclosure may subject our Company to liability under securities laws or enable outside parties to violate securities laws.

### B. Audit Committee Charter

44.     In addition to these duties, under the Audit Committee Charter in effect during relevant times, members of the Audit Committee owed specific additional duties to Tupperware. The Audit Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the financial reporting processes on behalf of the Board and reporting the results of its activities to the Board and preparation and certification of the Company's financial statements to guarantee the independent auditors' report, or to guarantee other disclosures by the Company, among other things:

Statement of Purpose

The purposes of the Audit and Finance Committee (the "Committee") of the Board of Directors of Tupperware Brands

Corporation (the "Corporation") shall be (1) to assist the Board of Directors in discharging its responsibilities relating to the oversight of the establishment, maintenance and monitoring of controls over the Corporation's financial policies, financial statements and disclosure responsibilities (including required reporting) in order to assure the integrity of the Company's financial statements; (2) selection, management, evaluation, compensation and replacement of independent auditors to the Corporation; (3) evaluation of the performance of the Corporation's internal audit function and its auditors; (4) oversight of the Corporation's compliance generally with laws and regulations, including compliance programs; and (5) oversight of the Corporation's financial structure.

**\* \* \***

II. <u>Assistance with Board Oversight</u>.

The Committee shall assist the Board of Directors with the oversight of the (1) integrity of the Corporation's financial statements, (2) Corporation's compliance with legal and regulatory requirements, (3) Corporation's independent auditor's qualifications and independence, and (4) performance of the Corporation's internal audit function and independent auditors.

III.    <u>Committee Report</u>.

The Committee shall prepare a Committee report as required by the Securities and Exchange Commission from time to time for inclusion in the Corporation's annual proxy statement to shareholders.

IV.    <u>Matters Concerning Independent Auditors</u>.

The Committee shall:

(1) have direct responsibility for the appointment, compensation, retention and oversight and pre-approval (subject to the de minimis exceptions for non-audit services under Section 10A of the Securities Exchange Act of 1934) of

the work of the Corporation's independent auditor for audit reports or other services (including tax services), including the resolution of disagreements between the auditor and management, and the independent auditor shall report directly to the Committee;

(2) at least annually, obtain and review a report by the

Corporation's independent auditor describing (a) the internal quality control procedures of the independent auditor; (b) any material issues raised by the most recent internal quality control review, or peer review, of the independent auditor or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the independent auditor, and any steps taken to deal with any such issues; and (c) all relationships between the independent auditor and the Corporation in order to assess the independent auditor's independence;

(3) evaluate the independent auditor's qualifications, performance and independence, including that of the lead partner, taking into account the opinions of the Corporation's management and internal auditors and the advisability of the rotation of the audit firm itself, and shall report thereon to the Board of Directors; and review with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including issues or difficulties raised in the course of the independent auditor's work and management's responses, including restrictions on scope of activities or access to information, significant disagreements with management, and the responsibilities, budget and staffing of the Corporation's internal audit function; and

(4) set the Corporation's hiring policies for employees or former employees of the independent auditor.

V. <u>Risk Assessment and Management</u>.

The Committee shall discuss (a) the Corporation's guidelines and policies regarding the governance by which risk assessment and management is undertaken by the Corporation's management, and (b) the Corporation's major financial and operational risk exposures and the steps management has taken to monitor and control such exposures.

VI.     <u>Matters Concerning Management Functions</u>.

The Committee shall:

> (1) review the function of the Internal Audit Department, its charter, budget, organization, scope, plans, coordination with the independent auditors, activities and performance, and report thereon to the Board of Directors;
> (2) approve the selection and/or discharge of the head of Internal Audit, which person shall be directly accountable to the Committee notwithstanding any accountability to management which the Committee may permit;
> (3) review the quality and depth of the financial and legal functions worldwide;
> (4) review the status of tax returns and tax audits; and
> (5) review officers' expenses.

VII. <u>Complaint Procedures</u>.

The Committee shall establish procedures for (a) the receipt, retention and treatment of complaints concerning accounting, internal accounting control or auditing matters, and (b) confidential, anonymous employee submission of concerns over the matters in the preceding clause (a).

VIII. <u>Engagement and Funding of Advisors</u>.

The Committee shall have the power and authority to undertake investigations into the affairs of the Corporation in the course of conducting the business of the Committee and to

retain such outside advisors, professionals, counsel and experts (including independent auditors), and to expend sums for administrative matters, as the Committee shall deem necessary or advisable for the purpose and at the expense of the Corporation at funding levels determined by the Committee.

IX.      Matters Concerning Financial Statements, Policies, Disclosures, Releases and Guidance.

The Committee's charge is that of oversight and the Corporation's management is responsible for preparing the Corporation's financial statements and the independent auditors are responsible for auditing those annual financial statements. The Committee shall be entitled to reasonably rely upon the representations of management and the independent auditors that the financial statements are prepared in accordance with generally accepted accounting principles. Additionally, the Committee recognizes that financial management (including the internal audit staff), as well as the independent auditors, have more time, knowledge and more detailed information on the Corporation than do Committee members; consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Corporation's financial statements or any professional certification as to the independent auditor's work. With this understanding, the Committee shall:

(1) review and discuss with management and the independent auditor the Corporation's annual and quarterly financial statements, including the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and determine whether or not to recommend to the board of directors that such materials be included in the Corporation's annual report on Form 10-K;

(2) discuss with management and the independent auditor significant financial reporting issues and adjustments made in connection with the Corporation's financials statements, including changes in accounting principles;

(3) review and discuss with management and the independent auditor any major issues as to the adequacy of the Corporation's internal controls, any special steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting;

(4) review and discuss with management and the independent auditor the Corporation's internal controls report and the independent auditor's attestation of the report prior to the filing of the Corporation's Form 10-K;

(5) review and discuss quarterly reports from the independent auditors regarding critical account policies and practices, alternative treatments of financial information under generally accepted accounting principles that have been discussed with management and the ramifications of the uses thereof, and other material written communications between management and the independent auditor;

(6) discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures, if any, on the Corporation's financial statements;

(7) review disclosures made to the Committee concerning internal controls (including significant deficiencies and/or material weaknesses) in connection with the certification process or fraud relating to the Corporation's filings with the Securities and Exchange Commission; and

(8) discuss the Corporation's earnings releases and information and guidance provided to analysts and ratings agencies, though such discussions may be general and need not be in advance of releases or guidance.

X. Matters Concerning Corporate Responsibility.

The Committee shall:

(1) recommend for approval by the Board of Directors a Code of Conduct and Code of Ethics for Financial Executives regarding

the Corporation's compliance with laws and regulations and ethical conduct, including any amendments thereto from time to time;

(2) periodically review the Corporation's compliance with legal and regulatory requirements and its programs and procedures designed to assure adherence to and enforcement with law and the codes; and

(3) review and approve, as required, all related-party transactions, including any requests for waiver of the Corporation's codes.

XI.      Matters Concerning Financial Structure.

The Committee shall periodically review and recommend to the Board of Directors, as needed:

(1) the overall financial structure and financial condition of the Corporation;

(2) the long-term financial needs and plans of the Corporation;

(3) dividend policy;

(4) the issuance or purchase of the capital stock of the Corporation;

(5) issuance or redemption of long-term debt of the Corporation or any of its subsidiaries, excluding normal sinking fund purchases;

(6) guarantee by the Corporation or any subsidiary of the Corporation of indebtedness of any other subsidiary of the Corporation or that of a third party;

(7) review investment returns related to assets of the Corporation's employee retirement and savings plans; and

(8) insurance coverage for the Corporation and its directors and officers.

45.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Tupperware, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company already incurred, Tupperware has needlessly expended, and will continue to needlessly expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

46.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business

prospects and internal controls; and (iii) artificially inflate the Company's stock price.

48.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of here because the action described herein occurred under the authority and approval of the Board.

49.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

50.     At all times relevant hereto, each of the Individual Defendants

was the agent of each of the other Individual Defendants and Tupperware and was at all times acting within the course and scope of such agency.

## FACTUAL BACKGROUND

51.    Tupperware is a global consumer products company. It specializes in producing and marketing items for kitchen and home use, including preparation, storage, and serving solutions. The Company's product range extends to cookware, knives, microwave accessories, microfiber textiles, water filtration products, and various items catering to consumers on the move, all marketed under the Tupperware brand.

52.    In March 2020, amidst a prolonged period of declining sales lasting nearly ten years, Tupperware undertook a significant change in its executive leadership. This change involved the appointment of Defendant Fernandez as the new CEO, marking a key step in the Company's Turnaround Plan. The initiation of this Turnaround Plan aligned with a substantial surge in sales for Tupperware throughout the remaining months of 2020. This increase was largely attributed to a shift in consumer behavior, as more individuals were preparing, consuming, and storing meals at home due to quarantines related to the COVID-19 pandemic.

53.    In 2021, Tupperware continued to implement its Turnaround Plan by introducing an "omnichannel" strategy. This initiative was designed to broaden the availability of Tupperware products, making them accessible

both in stores and online. This approach targeted new customer segments who were either unfamiliar with or not inclined to buy from direct sellers. In line with this strategy, Tupperware acknowledged that it "intentionally built up inventory" during 2021. This was a strategic move to align with the heightened sales levels experienced during the COVID-19 pandemic and to support sales across both the new channels and its traditional direct sales channel.

54.     During the Relevant Period, which coincided with Tupperware's phase of accumulating significant inventory, the Company faced unprecedented inflation in its operational costs, particularly in raw materials like resin. As a result, throughout this period, market analysts and investors closely monitored Tupperware's escalating expenses, expressing deep concerns about the Company's capacity to balance these rising costs with appropriate price hikes. In every conference call that the Individual Defendants participated in during the Relevant Period, they consistently addressed these issues, providing reassurances and pacifying the concerns of analysts.  Contrary to the reassurances of the Induvial Defendants, as the surge in COVID-related sales dwindled throughout 2021, Tupperware found itself in a precarious financial position with dwindling cash flows, making the movement of its accumulated inventory critical to generate much-needed cash.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

55.     On November 3, 2021, the Individual Defendants caused Tupperware to issue a press release announcing the Company's Q3 2021 results. That press release provided assurances to investors that, in relevant part:

> "We are continuing to build the foundation that will enable us to strengthen and evolve our business into a global, omnichannel, premium-branded company, and by expanding into new channels and product categories, we will achieve sustainable growth over the long term," said Miguel Fernandez, President and Chief Executive Officer of Tupperware Brands. "Despite challenging year-over-year comparisons and the persisting negative effects of the global pandemic, we are proud of our ability to post solid results during our ongoing turnaround. We are as confident as ever in our business outlook, our strategy, and our ability to execute."

> "We continue to execute on our high priority strategic initiatives, including the divestiture of our non-core beauty businesses and excess land holdings, the utilization of our share repurchase authorization, and further implementation of our tax strategy. These actions will further optimize our capital structure and position us well to drive long-term growth," said Sandra Harris, Chief Financial Officer and Chief Operations Officer of Tupperware Brands. "Our third quarter results demonstrate our ability to continue delivering on our Turnaround Plan, even while we respond to changing market conditions."

56.     Also on November 3, 2021, Tupperware conducted an earnings call with investors and analysts to review the Company's results for the third quarter of 2021 (referred to as the "Q3 2021 Earnings Call"). During the prepared segment of this call, Defendant Fernandez stated:

This is our sixth quarter of consistent successful execution against our 3-year turnaround plan. We're now at the midway point and are building a solid foundation for sustained growth and expansion.

***

Next year, 2022, will be the year of expansion where we really begin to enter new channels and product categories. And in 2023 and beyond, we will accelerate those efforts for long-term sustained growth.

During the quarter, we executed on several high-priority strategic initiatives that will improve our capital structure and position us well for the future. We will get into more detail on each of these later in the call, but at a high level, include, progressing on divesting our noncore assets, including our beauty businesses and excess property holdings, enabling us to focus more time and resources on growing our core Tupperware brands and utilizing the recently authorized share repurchase facility to buy back 1 million shares during the third quarter, accelerating returns to shareholders.

These actions support our turnaround plan and are important components that will enable us to grow, expand and ultimately achieve our long-term strategic goals.

***

We believe that our turnaround will not produce linear results as evidenced by the third quarter but that over time, both top and bottom line will improve as we implement our growth plans.

Now that we are 6 quarters into our third-year turnaround plan, this midway point feels like an appropriate time to summarize the progress we have made over the last 18 months. In short, the company was in a very different place in April of 2020.

***

We implemented a new sales force system in the U.S. during the

second quarter. Given that the legacy system was customized to the needs of our sales force for the last 20 years, the new technology solution caused disruption to our sales force in the past few months. We've begun working closely with our sales force over the past several weeks and believe one takes that technology will be enabler for our sales force to grow their business.

***

We're also using data-driven approach to segment how we look at our sales force and customers to personalize the experience they have with Tupperware. That means providing differentiated support, service and incentives to all of our sales force, our customers, ensuring we are adding value as a result, improving retention.

***

Looking ahead, it is our goal to be a very different and even stronger company 18 months from now. Our near-term priorities continue to be strengthening our direct selling business through structural service improvement, detail and product investment, use of data to optimize practices and expanding into new channels and product categories.

57.     On November 23, 2021, Tupperware released a press statement titled "Tupperware Brands Reduces Borrowing Costs and Increases Financial Flexibility with New $880M Credit Facility."  Specifically, the press release provided:

> "We are excited to have refinanced our credit facility at such attractive terms," said Sandra Harris, Chief Financial and Operations Officer of Tupperware Brands. "This transaction is another tangible example of the foundational improvements we've made to the business over the past eighteen months, and represents another significant milestone in Tupperware's ongoing Turnaround Plan. Our new credit facility enhances our financial flexibility and is consistent with our strategy to optimize the

capital structure of the Company while supporting future growth."

58.     On February 23, 2022, Tupperware issued a press release to announce the Company's results for both the fourth quarter and the full year of 2021. The press release included, specifically:

> "We delivered both top and bottom line growth in 2021 despite challenging operating conditions and while continuing to execute on the strategic initiatives of our Turnaround Plan, including making investments in systems, processes and people," said Miguel Fernandez, President and Chief Executive Officer of Tupperware Brands. "Our strategy has not changed, and we are on track to make our company as big as our brand. I am highly confident in our future trajectory and look forward to 2022 being a year of meaningful expansion."

> "Throughout 2021 we continued to fortify our financial foundation, which supports our steadfast commitment to strengthen the core business while also increasing consumer access to our products through new channels and categories," said Sandra Harris, Chief Financial Officer and Chief Operations Officer of Tupperware Brands. "We completed the sale of additional non-core assets and refinanced our credit facility at more favorable terms, including a significant rate reduction and increased operational flexibility. We also opened a new global sourcing office in Singapore, which will play a key role in optimizing our supply chain and supporting our expansion into new product lines, enabling the strategic growth of our iconic brand and emerging sub-brands. We are confident we are entering this year on solid footing, well positioned to continue executing against our plan in order to deliver sustainable growth and value to all stakeholders."

> ***

> **Full Year 2022 Continuing Operations Outlook**

> For full year 2022, the Company expects diluted adjusted earnings per share to be between $2.60 to $3.20, and operating cash flow net of investing cash flow to be between $120 million and $160 million.

This assumes a tax rate in the mid to high 20% range.

59.     On the same day, Tupperware submitted their Annual Report on Form 10-K to the SEC, detailing the Company's financial and operational results for the year ending December 25, 2021 (referred to as the "2021 10-K"). The 2021 10-K provided an overview of the company, stating specifically:

**Turnaround Plan Update**

In 2021, under the leadership of Fernandez, the Company continued to build the foundation to execute on a new growth strategy, one that leverages consumer acceptance of the iconic Tupperware brand and gives the Company the ability to expand into new product categories, increase consumer access points and grow distribution channels, all while strengthening the Company's core direct selling business. The Company continued to execute on its three-year Turnaround Plan[] with progress that included improvements in liquidity and strengthening of the capital structure through the sale of non-core assets; restructuring and refinancing the Company's debt; and the utilization of share repurchase authorization. The key elements of the Turnaround Plan continue to focus on: structurally fixing the Company's core business to create a more sustainable business model; shifting from a distributor push model to a consumer pull model to capture the needs of today's customer sets; opening up access to Tupperware products in channels where today's consumers want to shop; and expanding into new product categories to bring more innovative solutions to the market. The management team has made significant progress on these key elements of the Turnaround Plan all while continuing to evolve and deal with the continuing and changing impact on the world affected by COVID-19.

\*\*\*

**Business Strategy**

As its business strategy evolves, as part of the Turnaround

Plan, the Company is focused on accelerating modernization in two areas. First is improving the core direct sales business, introducing a data-driven approach to sales force marketing, communication and recruitment, and introducing new digital tools and training to make doing business more efficient. The Company is working on an approach to personalize the customer experience based on consumer behaviors and has defined two distinct groups within its sales force – those who want to build a business or career with the Company (the "Business Builders"), and those who want access to discounted or exclusive products (the "Preferred Buyers"). Future communications, service, support, and marketing approach will be tailored with these segmented audiences in mind.

Second, the Company is focused on business expansion opportunities, by shifting from a business model reliant solely on the direct sales channel to drive consumer demand, to a business model that creates a natural "pull and push" to the brand to lift up all channels in which Company products are available. This includes expanding into more product categories where the Tupperware brand is in demand and creating more access points for consumers to purchase Company products – both in person and online.

Company efforts are underway in creating a consumer-tailored product and pricing strategy intended to reach and address the needs of all consumer socioeconomic levels, while also exploring alternative revenue streams for incremental business-to-business opportunities and new licensing opportunities to leverage the value of its iconic brand. This strategy is designed to create additional brand awareness and create new leads for the Company's independent sales force and increase revenue from channels and consumers that the Tupperware brand does not reach today.

60.     Also on February 23, 2022, Tupperware conducted an earnings call with investors and analysts to review the Company's results for the fourth quarter of 2021 (known as the "Q4 2021 Earnings Call"). In the prepared section of the Q4 2021 Earnings Call, Defendant Fernandez made certain

pertinent remarks:

> As we ended 2021, we passed the midway point of our 3-year turnaround plan. In 2020, our priority was to stabilize the company. In 2021, our priority was to build a foundation for omnichannel growth. And in 2022, we will expand our efforts and increase our investments to make our products available to consumers wherever they choose to shop. And while we focus on building a strong foundation in 2021, we reported both top and bottom line growth in 2020 and in 2021.

***

> 2021 performance was a tale of 2 halves. Through the first half of 2021, we were ahead of our internal expectations and really seeing the initial benefits of using direct selling methods that we know are successful.

***

> In our core direct selling business, we're using a more data-driven approach to making better and smarter decisions. This includes segmentation of how we look at our sales force and our customers to personalize their experience with Tupperware and, in some cases, introducing preferred customer loyalty programs in our biggest markets. We're also turning around unprofitable markets through changing our sales models and supplementing with business expansion strategies. When we started the turnaround plan, we had 18 markets that we're losing money. By converting these markets to a more omnichannel approach, this 18 formerly struggling markets now represent over $180 million in revenue and are contributing over 14% operating profit return on sales.

***

> Our focus in 2022 is globalizing direct selling best practices, accelerating new product development, increasing consumer access through omnichannel efforts, including expanded product access in the U.S. and Canada, stabilizing in China. The entire Tupperware team, our sales force, our associates, our Board and our executive team is excited about the future.

*** 

In closing, 2021 was a year of challenges, but we continue to execute against our turnaround plan, making fundamental changes and investments necessary for our unprecedented transformation.

We're proud of our progress and enter the second half of our year in the turnaround on a strong foundation that will enable us to enter into new channels and product categories and increase consumer access to our iconic products. Our goal is to make this business as big as our brand, and I have confidence in our ability to achieve that.

61.     On February 28, 2022, Tupperware issued a press release announcing a $75 Million Accelerated Share Repurchase Program. The press release stated, in relevant part:

"Today's announcement demonstrates confidence in our strategy, our future growth trajectory, and our financial strength," said Sandra Harris, Chief Financial and Operations Officer of Tupperware Brands. "Our strong balance sheet and compelling free cash flow generation enable investments in our growth initiatives as well as capital returns, and this transaction underscores our commitment to delivering value to our shareholders."

62.     The above statements were materially false and misleading, and failed to disclose material adverse facts about the Company's business and operations. Specifically, the Individual Defendants misrepresented and/or failed to disclose that: (i) Tupperware was encountering considerable difficulties in sustaining its earnings and sales performance; (ii) as a result, the full year 2022 guidance provided by Tupperware was unrealistic and/or

unattainable; (iii) the disclosure of all these issues was likely to significantly negatively affect Tupperware's financial health; and (iv) consequently, the Company's public declarations were materially false and deceptive at all pertinent times.

## THE TRUTH EMERGES

63.     On May 4, 2022, Tupperware issued a press release announcing the Company's Q1 2022 financial results. The press release stated, in relevant part:

> "We exited 2021 encouraged that our Turnaround Plan was on track, however with today's results we acknowledge that this turnaround still requires a lot more work,"
> said Miguel Fernandez, President and Chief Executive Officer of Tupperware Brands. "Results came in below our expectations due to a combination of external and internal factors. Sales were negatively impacted by the Russia/Ukraine conflict, as well as strict COVID-related lockdowns in China and internal challenges in execution, technology, and service. Profitability was significantly impacted by persisting inflationary pressures and the latency between rising input costs and our decision to increase prices. This quarter illuminated elements within our core direct selling business that still require fundamental improvement, and we are refocusing our efforts to address them. While we acknowledge the near-term delay this has on our Turnaround Plan timeline, we believe our business will become stronger as a result of the structural changes we are making. Due to the high degree of operational uncertainty we currently face, we have decided to withdraw our previously issued financial guidance for 2022. We remain confident in our ability to execute on our Turnaround Plan and growth strategy, with the end goal being to make this company as big as our iconic Tupperware brand."

***

Total net sales were $348.1 million, a decrease of 16% (or 14% on a constant currency basis) compared to the prior year period. Net sales were down in all segments, and the decrease was primarily driven by lower recruiting and overall sales force activity, in part due to the Russia/Ukraine conflict and lockdowns caused by the Omicron variant of COVID-19, particularly in China, as well as product mix and service issues. For detailed performance by region, please refer to the segment tables in the appended exhibit.

\*\*\*

Income from continuing operations was $2.5 million, as compared to $44.0 million for the prior year period. Diluted earnings per share from continuing operations was $0.05, as compared to $0.82 for the prior year period. The decrease was primarily driven by lower volumes and higher resin and logistics costs, as well as higher levels of investment spending. Adjusted diluted earnings per share from continuing operations (non-GAAP) was $0.12, as compared to $0.81 for the prior year period. The decrease was primarily driven by lower volumes, higher resin and logistics costs, and higher levels of investment spending, partially offset by lower interest expense from lower rates negotiated as part of the debt refinancing completed in the fourth quarter of 2021.

\*\*\*

## Withdrawal of Full Year 2022 Continuing Operations Outlook

Due to its first quarter 2022 performance, the rapidly changing inflationary environment, uncertainty relating to the full impact of the Russia/Ukraine conflict and the Omicron variant of COVID-19 on its business, as well as the volatility relating to fundamental changes being made to its business, the Company no longer believes it will achieve its full year 2022 targets for diluted adjusted earnings per share and operating cash flow net of investing cash flow, and has therefore decided to withdraw its previously issued guidance. The Company will consider establishing a new outlook at such time that it has improved visibility.

### Appointment of New Chief Financial Officer

The Company announces the appointment of Ms. Mariela Matute to the position of Chief Financial Officer, effective May 24, 2022. Ms. Matute is a seasoned finance executive who will join Tupperware with more than 20 years of experience spanning the technology, consumer, and manufacturing sectors, including in her current role as CFO of Calavo Growers, a publicly traded global leader in fresh foods processing and distribution, where she helped drive the transformation and turnaround of the 100-year old company. Ms. Matute also brings blue-chip global finance leadership and perspective to the Company, having overseen global finance teams across multiple continents.

64.     Despite the Company attributing its poor performance to the Russia-Ukraine conflict, Defendant Harris provided a seemingly contradictory statement during an earnings call discussing the Company's Q1 2022 results. Specifically, Harris noted, "Russia-Ukraine [. . .] is about 2% to 3% of [the Company's] revenue so it's not overly significant."

65.     On this news, Tupperware's stock price fell $5.76 per share, or 32.16%, to close at $12.15 per share on May 4, 2022.

66.     On March 1, 2023, before the market opened, the Company announced that it had identified misstatements in prior annual and unaudited interim periods. In particular, these misstatements related to the Company's historical accounting for income taxes. It expected to report at least one material weakness, stating the following, in pertinent part, in its current report filed with the SEC on Form 8-K:

In connection with its year end financial close process, the

Company has identified misstatements which originated in prior annual and unaudited interim periods, the most significant of which to date relate to the Company's historical accounting for income taxes. Until the Company has completed its final close process, there is the possibility that additional current and prior period misstatements could be identified. The Company will reflect the correction of the previously issued financial statements in its Annual Report on Form 10-K for the 2022 fiscal year (the "Form 10-K"). The Company is evaluating the method of correction. The preliminary results as of and for the interim and annual periods ended December 25, 2021 have been adjusted to correct for the prior periods misstatements identified through the date of this press release.

In addition, the Company concluded that it did not design and maintain effective internal controls related to the accounting for the completeness, occurrence, accuracy, and presentation of the income tax provision and related income tax assets and liabilities. Accordingly, in the 2022 Form 10-K, the Company will disclose a material weakness in internal control over financial reporting and, as a result, that its disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2022.

67.     On this news, Tupperware's stock fell 14.88% to close at $3.49 per share on March 1, 2023, on unusually heavy trading volume, damaging investors.

68.     Then, on March 16, 2023, after the market closed, the Company filed with the SEC a Late filing notice on Form NT 10-K (the "Late Filing Notice"), reporting that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2022 "by the prescribed due date, without unreasonable effort or expense because it requires additional time to complete the Form 10-K, including the restatement of certain of its previously issued

financial statements as described below." The Late Filing Notice went on to state, in pertinent part:

> On March 12, 2023, the Audit and Finance Committee of the Board of Directors of the Company, upon recommendation by the management of the Company and in consultation with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, concluded that the Company's previously issued consolidated financial statements as of and for the years ended December 26, 2020 and December 25, 2021, and the previously issued unaudited interim condensed consolidated financial statements in 2021 and the first three quarters of 2022 (collectively, the "Relevant Periods"), as well as the associated press releases, were materially misstated and should be restated and no longer be relied upon because of the identification of material prior period misstatements.

> To correct for such material misstatements, the Company will restate its consolidated financial statements for the years ended December 26, 2020 and December 25, 2021, in connection with the filing of its Form 10-K. Restated financial information as of and for the impacted 2022 and 2021 quarterly and year-to-date periods will be included in the 2022 Form 10-K. The Company will effect the restatement of its 2022 unaudited condensed consolidated quarterly financial statements in connection with the future filings of its Quarterly Reports on Form 10-Q in 2023.

> To date, the misstatements that originated in periods prior to 2020 are expected to result in a $23-28 million reduction to the previously reported 2020 beginning retained earnings, with such reduction primarily resulting from misstatements related to income taxes. The Company also currently estimates that the net impact of the prior period misstatements on the restated financial statements will result in an increase in net income from continuing operations for the year ended December 26, 2020, and a decrease in net income from continuing operations for the year ended December 31, 2021 and for the 2022 unaudited interim periods. However,

such estimates are preliminary and are subject to change as the Company completes its financial close process, and such changes could be significant.

The Company also has determined that material weaknesses existed in the Company's internal control over financial reporting as of December 31, 2022 in the following areas: The Company did not design and maintain effective controls in response to the risks of material misstatement. Specifically, changes to existing controls or the implementation of new controls were not sufficient to respond to changes to the risks of material misstatement in financial reporting. This material weakness contributed to the following material weaknesses: (i) accounting for the completeness, occurrence, accuracy and presentation of income taxes, including the
income tax provision and related income tax assets and liabilities; and (ii) completeness, accuracy and presentation of right of use assets and lease liabilities. There can be no assurance that additional material weaknesses will not be identified as the Company completes its financial close process.

Due to the time and effort required to complete the preparation of the restated consolidated financial statements for the Relevant Periods, the Company was unable, without unreasonable effort or expense, to complete and file the Form 10-K within the prescribed time period. The Company is endeavoring to complete its financial close process and Form 10-K filing as promptly as possible; however, there can be no assurance that the Company will be able to file the Form 10-K within the extension period.

69.     Then, also on March 16, 2023, after the market closed, the Company filed with the SEC a Current Report on Form 8-K stating, in pertinent part:

During the financial year-end close process of Tupperware Brands Corporation (the "Company" or the "Registrant"), management, with assistance from its tax and accounting advisors, identified several adjustments related to prior and current periods that have given rise to a restatement of previously issued financial

statements. The Company believes that the adjustments identified to date are primarily non-cash corrections related to income taxes and lease accounting treatment. As a result, the Company expects to delay the filing of its 2022 Annual Return on Form 10-K, as further discussed below.

On March 12, 2023, the Audit and Finance Committee of the Company's Board of Directors, based on the recommendation of management of the Company and after consultation with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, concluded that the Company's previously issued consolidated financial statements as of and for the years ended December 26, 2020 and December 25, 2021, and the previously issued unaudited interim condensed consolidated financial statements in 2021 and the first three quarters of 2022 (collectively, the "Relevant Periods"), as well as the associated earnings press releases, were materially misstated and therefore the financial statements should be restated and the financial statements and earnings press releases should no longer be relied upon.

While preparing the consolidated financial statements for the year ended December 31, 2022, the Company identified multiple prior Relevant Period misstatements, the most material of which identified to date relate to the Company's accounting for income taxes and leases. These newly identified misstatements are in addition to other prior Relevant Period misstatements previously identified by the Company during 2022, as well as misstatements that were previously identified and disclosed in the Company's Annual Reports on Form 10-K as of and for the years ended December 25, 2021 and December 26, 2020 and in certain 2022 and 2021 Quarterly Reports on Form 10-Q. These previously identified misstatements were initially corrected as out of period correcting adjustments in the financial statements related to the periods of identification. After consideration of both newly identified and previously identified misstatements, taken both individually and in the aggregate, and assessed quantitatively and qualitatively, the Company's Audit and Finance Committee, based on management's recommendation, concluded that such misstatements were material to the Company's previously issued financial statements for the Relevant Periods.

The Company will correct for such misstatements by restating its 2021 and 2020 consolidated financial statements, in connection with the filing of its 2022 Annual Report on Form 10-K. Restated financial information as of and for the impacted 2022 and 2021 quarterly and year-to-date periods will be included in the 2022 Form 10-K. The Company will effectuate the restatement of its 2022 unaudited condensed consolidated quarterly financial statements in connection with the future filings of its Quarterly Reports on Form 10-Q in 2023.

To date, the misstatements that originated in periods prior to 2020 are expected to result in a $23-28 million reduction to the previously reported 2020 beginning retained earnings, with such reduction primarily resulting from misstatements related to income taxes. The Company also currently estimates that the net impact of the prior period misstatements on the restated financial statements will result in an increase in net income from continuing operations for the year ended December 26, 2020, and a decrease in net income from continuing operations for the year ended December 31, 2021 and for the 2022 unaudited interim periods. However, such estimates are preliminary and are subject to change as the Company completes its financial close process, and such changes could be significant.

Additionally, the Company has determined that material weaknesses exist in its internal control over financial reporting as of December 31, 2022. The Company did not design and maintain effective controls in response to the risks of material misstatement. Specifically, changes to existing controls or the implementation of new controls were not sufficient to respond to changes to the risks of material misstatement in financial reporting. This material weakness contributed to the following material weaknesses related to the:

- Accounting for the completeness, occurrence, accuracy and presentation of income taxes, including the income tax provision and related income tax assets and liabilities; and
- Accounting for the completeness, accuracy and presentation of right of use assets and lease liabilities.

As a result, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of March 26, 2022, June 25, 2022, September 24, 2022, and December 31, 2022.

There can be no assurance that additional material weaknesses will not be identified as the Company completes its financial close process. The Company's management and the Audit and Finance Committee have discussed the matters disclosed in this Item 4.02 with the Company's independent registered public accounting firm PricewaterhouseCoopers LLP. The Company is working to complete its financial close process and complete its 2022 Annual Report on Form 10-K, including the 2021 and 2020 restated financial statements and quarterly restated financial information as further discussed above, as promptly as possible. On March 16, 2023, the Company expects to file a Notification of Late Filing on Form 12b-25 in order to obtain an additional fifteen calendar days in which to endeavor to file the 2022 Form 10-K, however, there can be no assurance that the 2022 Form 10-K will be filed within such period.

70.     On this news, the price of Tupperware's stock declined by $0.19 cents a share, or 7.7%, on March 17, 2023.

### **Summary of the Individual Defendants' Wrongful Conduct**

71.     The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

72.     The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure

controls and procedures.

73.     The Individual Defendants breached their fiduciary duties to Tupperware because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch that: (i) Tupperware was encountering considerable difficulties in sustaining its earnings and sales performance; (ii) as a result, the full year 2022 guidance provided by Tupperware was unrealistic and/or unattainable; (iii) the disclosure of all these issues was likely to significantly negatively affect Tupperware's financial health; and (iv) consequently, the Company's public declarations were materially false and deceptive at all pertinent times.

## DAMAGES TO TUPPERWARE

74.     As a direct and proximate result of the Individual Defendants' conduct, Tupperware will lose and expend many millions of dollars.

75.     Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO, and its CFO any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

76.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

77.     As a direct and proximate result of the Director Defendants' conduct, Tupperware has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## TUPPERWARE'S NON-EMPLOYEE DIRECTOR COMPENSATION

78.     The Board and Compensation Committee have repeatedly approved excessive director compensation without the approval of shareholders and without providing information or data to support their decisions.  Notably, as the Company's share price fell the Board continued to increase its own compensation.

79.     As reflected in the chart below from the Company's Annual Proxy filed with the SEC on March 22, 2021, annual compensation per non-employee director in 2020 was $246,590.[3]

---

[3] Excluding Catherine A. Bertini (retired from the Board on February 19, 2020), E.V. (Rick) Goings (retired from the Board on February 19, 2020), Angel R. Martinez (retired from the Board on February 19, 2020), Christopher D. O'Leary (joined Board on April 6, 2020), Joyce M. Roché (retired from the Board on February 19, 2020) who did not serve full years on the Board in 2020.

| Name | Fees Earned or Paid in Cash[1] ($) | Fees Earned or Paid in Stock[2] ($) | Stock Awards[2] ($) | Changes in Pension Value and Nonqualified Compensation Earnings ($) | All Other Compensation[3] ($) | Total ($) |
|---|---|---|---|---|---|---|
| Catherine A. Bertini[4] | 110,000 | 0 | 0 | 0 | 3,500 | 113,500 |
| Susan M. Cameron | 108,750 | 90,000 | 130,000 | 0 | 90 | 328,840 |
| Kriss Cloninger III | 54,000 | 45,000 | 130,000 | 0 | 90 | 229,090 |
| Meg Crofton | 93,750 | 0 | 130,000 | 0 | 90 | 223,840 |
| E.V. (Rick) Goings[4] | 32,500 | 25,000 | 0 | 0 | 0 | 57,500 |
| Aedhmar Hynes | 90,000 | 50,000[2] | 130,000 | 0 | 90 | 270,090 |
| Angel R. Martinez[4] | 110,000 | 0 | 0 | 0 | 0 | 110,000 |
| Christopher D. O'Leary[5] | 74,000 | 0 | 97,500 | 0 | 90 | 171,590 |
| Richard T. Riley | 108,000 | 0 | 130,000 | 0 | 90 | 238,090 |
| Joyce M. Roché[4] | 98,750 | 11,250 | 0 | 3,123[6] | 0 | 113,123 |
| Mauro Schnaidman | 65,000 | 50,000[2] | 97,500 | 0 | 90 | 212,590 |
| M. Anne Szostak | 90,000 | 0 | 130,000 | 0 | 3,590 | 223,590 |

80.     As reflected in the chart below from the Company's Annual Proxy filed with the SEC on March 22, 2022, annual compensation per non-employee director in 2021 was $328,363.[4]

---

[4] Excluding Kriss Cloninger III (retired from the Board on May 4, 2021), Deborah G. Ellinger (joined Board on March 15, 2021), James H. Fordyce (joined Board on March 15, 2021), Pamela J. Harbour (joined Board on November 1, 2021), Aedhmar Hynes (retired from the Board on May 4, 2021), Timothy Minges (joined Board on March 15, 2021), and Mauro Schnaidman (retired from the Board on May 4, 2021) who did not serve full years on the Board in 2021.

| Name | Fees Earne or Paid in Cash ($) | Fees Earned or Paid in Stock[1] ($) | Stock Awards[1] ($) | Changes in Pension Value and Nonqualified Compensation Earnings ($) | All Other Compensation[2] ($) | Total ($) |
|---|---|---|---|---|---|---|
| Susan M. Cameron | 131,000 | 100,000 | 173,808 | — | 155 | 404,963 |
| Kriss Cloninger III[3] | 90,000 | 25,000 | — | — | 53 | 115,053 |
| Meg Crofton | 133,000 | — | 173,808 | — | 155 | 306,963 |
| Deborah G. Ellinger[4] | 75,000 | — | 147,808 | — | 3,655 | 226,463 |
| James H. Fordyce[4] | 3,000 | 75,000 | 147,808 | — | 155 | 225,963 |
| Pamela J. Harbour[4] | 25,000 | — | 65,000 | — | 102 | 90,102 |
| Aedhmar Hynes[3] | 115,000 | — | — | — | 53 | 115,053 |
| Timothy Minges[4] | — | 75,000 | 147,808 | — | 155 | 222,963 |
| Christopher D. O'Leary | 145,000 | — | 173,808 | — | 155 | 318,963 |
| Richard T. Riley | 95,000 | 50,000 | 173,808 | — | 155 | 318,963 |
| Mauro Schnaidman[3] | 115,000 | — | — | — | 53 | 115,053 |
| M. Anne Szostak | 114,500 | — | 173,808 | — | 3,655 | 291,963 |

81.     These amounts are excessive, and approach or exceed the average director compensation for non-employee directors on boards of "large-cap" companies, companies included in the S&P 500, and even the largest companies in the country, which are included within the Top 200 Company list.[5]

82.     Tupperware is neither a Top 200 Company, member of the S&P 500, nor even a large-cap company. Indeed, with a current market

---

[5] *See* NACD and Pearl Meyer 2020-2021 Director Compensation Report (average of median total direct annual compensation of $311,955 for non-employee directors at a Top 200 Company (with market capitalizations exceeding $10 billion), and an average of median total direct annual compensation of $256,225 for non-employee directors at large-cap companies (with market capitalizations between $2.5 billion and $10 billion)); 2021 U.S. Spencer Stuart Board Index (total average compensation of $312,279 for non-employee directors at S&P 500 companies); 2020 U.S. Spencer Stuart Board Index (total average compensation of $308,462 for non- employee directors at S&P 500 companies); 2019 U.S. Spencer Stuart Board Index (total average compensation of $304,856 for non-employee directors at S&P 500 companies); 2018 U.S. Spencer Stuart Board Index (total average compensation of $298,981 for non-employee directors at S&P 500 companies).

capitalization of approximately $95 million, Tupperware is considered a "small-cap" company.

83.   Tupperware attempts to justify its director compensation in the 2022 Proxy with the following:

> Each May, up to and including May 2021, the Nominating Committee, working in conjunction with management and Meridian (the Board's external compensation consultant), reviewed the Company's non-employee director compensation program value and designed and approved a plan for the coming year. This review compared the Company's plan against trends and best practices in the external marketplace. For the purpose of determining market compensation, the Nominating Committee used the same compensation peer group developed for executive compensation benchmarking noted above under the heading "Peer Group & Compensation Benchmarking". Beginning in May 2021, director compensation became the responsibility of the Compensation Committee, following the same philosophy and methodology.

84.   That a compensation consultant was retained and did work is insufficient to establish the appropriateness of the Company's non-employee director compensation. Just because a consultant was retained does not mean that their advice was sound or followed.

85.   Tupperware's non-employee director compensation would be shocking enough, even at a large and profitable Company. Here, however, it lacks even the appearance of propriety, given that the Company's financial state. Thus, the Company's non-director compensation practices seem to take

no consideration of its financial well-being whatsoever and have harmed the Company and its stockholders.

<u>**DERIVATIVE ALLEGATIONS**</u>

86.    Plaintiff brings this action derivatively for the benefit of Tupperware to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

87.    Plaintiff will adequately and fairly represent the interests of Tupperware and its stockholders in enforcing and prosecuting its rights.

88.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock at all relevant times.

89.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

90.    On May 31, 2023, Plaintiff made the Demand to the Board demanding that the Board investigate the wrongdoing set forth herein and take appropriate action, including commencing litigation against current and former officers and directors.

91.    On June 8, 2023, Tupperware's counsel wrote the Tupperware Response to Plaintiff's counsel, stating that the Board was not "taking any position upon the merits of [Plaintiff's] demands" and "is simply deferred further action at the present" because of overlap with the issues in the Demand

and the Securities Action, as well as, a demand futility derivative matter filed in state court.[6]   As such, Plaintiff has not received a substantive response to the Demand or date on which any investigation would begin. Accordingly, the Demand in this case was refused.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Fiduciary Duty**
**Against the Individual Defendants**

92.     Plaintiff hereby incorporates the allegations in  paragraphs 1 through 91 as if fully set forth herein.

93.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tupperware's business and affairs.

94.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Tupperware's shareholders.

---

[6] On June 22, 2023, Plaintiff's counsel provided the Board's counsel with the proof of ownership requested in the Tupperware Response.

95.     In breach of their fiduciary duties owed to Tupperware, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

96.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tupperware's securities.

97.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were

available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tupperware's securities.

98.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

99.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tupperware has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff, on behalf of Tupperware, has no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty – Excessive Compensation**
**Against Fernandez, Cameron, Crofton, Ellinger, Fordyce, Goudis, Harbour, Minges, O'Leary, Riley, and Szostak (the "Director Defendants")**

100.     Plaintiff hereby incorporates the allegations in  paragraphs 1 through 91 as if fully set forth herein.

101.     The Director Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligations of good faith, candor, loyalty, and due care.

102.     The Director Defendants, together and individually, violated and breached their fiduciary duties of good faith, candor, loyalty, and due care.

Specifically, the Director Defendants approved their own improper and grossly excessive compensation without meaningful limits or controls, and without regard for the compensation paid by peers, or the Company's stock price, revenue, and market capitalization.

103.    The Director Defendants also breached their fiduciary duties to Company shareholders by failing to take remedial action in the face of these excessive awards.

104.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Tupperware has sustained significant damages. As a result, the Director Defendants are liable to the Company.

**COUNT III**
**Violations of Section 14(a) of the Exchange Act**
**Against the Director Defendants**

105.    Plaintiff hereby incorporates the allegations in paragraphs 1 through 91 as if fully set forth herein.

106.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

> [i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

107.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

108.    Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Annual Proxy filed with the SEC on March, 22 2022 ("2022 Proxy"). Specifically, the 2022 Proxy Statement falsely stated or failed to disclose that (i) Tupperware was encountering considerable difficulties in sustaining its earnings and sales performance; (ii) as a result, the full year 2022 guidance provided by Tupperware was unrealistic and/or unattainable; and (iii) the disclosure of all these issues was likely to significantly negatively affect Tupperware's financial health.

109.    The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the 2022 Proxy were materially false and misleading.

110.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2022 Proxy.

111.    Plaintiff has no adequate remedy at law.

## COUNT IV
## Unjust Enrichment
## Against the Individual Defendants

112.    Plaintiff hereby incorporates by reference the  allegations in paragraphs 1 through 91 as if fully set forth herein.

113.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Tupperware.

114.    Each of the Defendants received payment from Tupperware, in the form of either salary or director fees while actively breaching their fiduciary duties to Tupperware.

115.    All the payments and benefits provided to defendants were at the expense of Tupperware. The Company received no benefit from these payments.

116.    Plaintiff, as a shareholder and a representative of Tupperware, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties. Plaintiff on behalf of Tupperware, has no adequate remedy at law.

**COUNT V**
**Waste of Corporate Assets**
**Against the Individual Defendants**

117.    Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through 91 as if fully set forth herein.

118.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Tupperware to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

119.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

120.    Plaintiff on behalf of Tupperware has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)    Declaring that the Plaintiff may maintain this action on behalf of Tupperware, and that Plaintiff is an adequate representative of the Company;

b)    Determining and awarding to Tupperware the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above

from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

c)      Directing the Individual Defendants to take all necessary actions to reform and improve Tupperware's corporate governance and internal procedures to comply with applicable laws and to protect Tupperware and its shareholders from a repeat of the damaging events described herein;

d)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

e)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 17, 2024

**COOK LAW, P.A.**

By: _/s/ William J. Cook_____
William J. Cook
Florida Bar No. 986194
610 East Zack Street, Suite 505
Tampa, Florida 33602
Telephone: 813/489-1001
Facsimile: 813/489-1008
wcook@cooklawfla.com

*Local Counsel for Plaintiff*

**KUEHN LAW, PLLC**

Justin Kuehn
53 Hill Street, Suite 605
Southampton, NY 11968
Phone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*